IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON CHAPTER, NAACP, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NANCY B. BEECHER, et al.,<br><br>Defendants. | Civil Action Nos. 72-3060, 73-269-PBS |
| PEDRO CASTRO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NANCY B. BEECHER, et al.,<br><br>Defendants. | Civil Action Nos. 70-1220-W, 74-2982-C |

## STATUS REPORT OF PLAINTIFFS AND PLAINTIFF-INTERVENORS

Pursuant to the Court's direction at the status conference held on January 4, 2022, the plaintiffs and plaintiff-intervenors (hereinafter "Plaintiffs") submit this status report.

The consent decrees in this case have been enormously beneficial in undoing past discrimination by diversifying Massachusetts's police and fire departments. All but a few departments in the Commonwealth have achieved the parity goal set forth in the decrees and are no longer subject to the decrees as a result. Notwithstanding this important progress in the majority of departments, the consent decrees, as modified by this Court, continue to serve an imperative role to foster progress in the remaining departments subject to the decrees.

1

At the status conference held on January 4, 2022, the Court asked the parties to set forth, in their annual status report this year, their views on when the consent decrees should end. Plaintiffs share an interest with Defendants and the Court in expediting the life of the consent decrees, and believe that progress continues to be made towards that goal, particularly since the 2018 modifications. For the reasons set forth below, Plaintiffs submit that the decrees, with the modifications recently implemented by the Court, should be allowed to run their intended course and to expire when the few remaining decree-bound departments achieve the parity goals. In the alternative, should the Court decide to sunset the consent decrees, Plaintiffs submit that the decrees should remain in place for as many years as the Court determined that the "cap"[1] adversely affected minority[2] candidates in those municipalities. A presumptive end date for those remaining municipalities should be set, with the parties retaining the ability to request an earlier end date if rough parity is reached.

## I.     Historical Background

This consolidated action involves two consent decrees that govern how entry-level police officers and firefighters are hired in certain Massachusetts municipalities. *See* Consent Decree, *Castro v. Beecher*, Nos. 70-1220-W, 74-2982-C (D. Mass., June 27, 1975) (police consent decree); *Boston Chapter, NAACP, Inc. v. Beecher*, 371 F. Supp. 507, 520-22 (D. Mass.) (firefighter consent decree), *aff'd*, 504 F.2d 1017 (1st Cir. 1974). Plaintiffs set forth a complete history of the litigation in this case in Dkt. 31. *See* Dkt. 31 at 2-9.

---

[1] The "cap" refers to the consent decrees' "adverse and unintended effect of 'capping' minority representation in certain remaining consent-decree cities" whereby the "one-to-three ratio effectively created a cap on minority hiring in cities that had a minority population that exceed 25 percent." *See Bos. Chapter, NAACP, Inc. v. Beecher*, 295 F. Supp. 3d 26, 29 (D. Mass. 2018).

[2] For simplicity, Plaintiffs will use the term "minority" herein to refer to Black and Hispanic individuals. The term "nonminority" will be used to refer to all other individuals.

Throughout the history of the consent decrees, the First Circuit has refused to apply any definite termination date to the decrees other than rough parity and has re-affirmed time and time again the consent decrees' parity goal.  *See Beecher*, 295 F. Supp. 3d at 29 ("The First Circuit has thrice reaffirmed—in *Mackin*[ *v. City of Bos.*, 969 F.2d 1273 (1st Cir. 1992), *opinion corrected* (July 20, 1992)] in 1992, *Quinn v. City of Boston*[, 325 F.3d 18 (1st Cir. 2003)] in 2003, and *Sullivan[ v. City of Springfield*, 561 F.3d 7 (1st Cir. 2009)] in 2009—that a city would not be released from the consent decrees until "rough parity" was reached."); *Mackin*, 969 F.2d at 1277 (refusing to end decrees on ground that qualifying examinations were validated as "nondiscriminatory" under guidelines of Equal Employment Opportunity Commission, stating that "[e]ven a cursory reading makes it crystal clear that validated examinations are not an end in themselves but merely a means toward achieving the decree's actual objective: *rough parity (to remedy the effects of past discrimination)*" (emphasis added)).

And as a result of the continued operation of the decrees, Massachusetts police and fire departments are now considerably more diverse than they were at the time of the lawsuits giving rise to the decrees.  Currently, among Massachusetts municipalities with a minority population of at least 1 percent, all but six police departments[3] and three fire departments[4] have achieved a level of minority representation that is commensurate with minority representation in the municipality as a whole.  Thus, the vast majority of communities that originally were subject to the police and fire decrees no longer are bound by them.

---

[3] The parties note in their joint filing their agreement that the Brockton Police Department has achieved rough parity.

[4] The parties note in their joint filing their agreement that the Springfield Fire Department has achieved rough parity.

Nonetheless, there are departments that continue to lag in minority hiring. In those communities, the decrees continue to serve an important role to encourage progress towards parity. By way of example, HRD consults Plaintiffs' counsel, WilmerHale and Lawyers for Civil Rights, when departments are seeking to hire new candidates to ensure that the certification lists follow this Court's order (Dkt. 74) and, when mistakes are discovered, HRD and Plaintiffs work together collaboratively to rectify any discrepancies. As this Court well knows, the resulting certification lists from that process dictate how police officers and firefighters are hired in the municipalities subject to the consent decrees. As a result, the majority of departments still affected by the decrees have made gains towards parity in recent years.

## II.     The Discovery of the Cap

In August 2016, Plaintiffs and Defendant Human Resources Division ("HRD") jointly moved for an additional modification to the police and fire decrees. The impetus behind the motion was the discovery that, in some cases, application of the decrees' ratio-based certification procedures was moving minority candidates down a certification list from the position they would otherwise occupy, which effectively created a cap on minority hiring in cities that had a minority population that exceeded 25 percent. In its February 21, 2018 opinion, the Court noted that "[a]s the minority population in these cities increased after the 1970s, the formula, which was supposed to remedy the effects of the racially discriminatory examinations, unfortunately turned out to impede minority hiring." *Beecher*, 295 F. Supp. 3d at 29. The modification directed HRD to suspend application of the ratio system when such application would lower the position of any minority candidate on a certification list and was designed with the goal of ensuring that the decrees never again would reduce the opportunity for a minority candidate to be considered or hired for a position with a Massachusetts police or fire department. The Court granted the motion, thereby implementing the modification, at a hearing held in September 2016.

At the same hearing, the Court directed the parties to determine whether there were identifiable individuals who had been harmed by the consent decrees pre-modification. *See* Dkt. 22 at 2-3. In a joint filing on January 20, 2017, the parties noted that "many more Black and Hispanic candidates have taken and passed the entrance examination than when the consent decrees were first entered in the 1970s…." *Id*. at 3. However, HRD's data limitations made it challenging to identify harmed individuals. Specifically, HRD was only able to assess data going back to 2012. *See id*. at 3 n.1 ("A similar analysis of pre-2012 lists is not possible due to the complete changeover in HRD's computer systems just prior to 2012 and the consequent loss of access to pre-2012 data."). Ultimately, it was only possible to identify 55 specific individuals who had been potentially harmed by the cap.

The parties jointly proposed a modification under which these 55 identified minority candidates who had been moved down in rank order on a certification list as a result of the operation of the decrees would be placed at the top of any current or future certifications used for a police or fire department in their respective municipalities. The status report explained that such a modification would be consistent with the equitable powers provided to the state Civil Service Commission pursuant to Chapter 310 of the Acts of 1993. The status report also informed the Court that the parties were discussing options for longer-term modifications to the decrees, and that such modifications likely would be directed at helping those communities with high minority populations to achieve parity.

### III. The Court's February 21, 2018 Opinion

On February 21, 2018, the Court issued an opinion regarding the parties' proposed modifications. The Court declined Defendants' request to impose a termination date, irrespective

of whether the goal of parity has been reached, with respect to the consent-decree cities whose harm pre-dated the 2010 census.[5]  *Beecher*, 295 F. Supp. 3d at 34-37.  The Court explained:

> In [Defendants'] view, the consent decrees should run for another five years and then sunset, irrespective of whether the goal of parity has been reached.  Relying on the doctrine of stare decisis, Plaintiffs argue in favor of retaining parity as the goal, and advocate for annual monitoring and reporting to keep the Court apprised of progress towards meeting the goals of the consent decrees.  They oppose any predetermined cutoff date as arbitrary.  They also stress that the goal of parity has been directed by the First Circuit in *Castro* and reaffirmed in *Mackin*, *Quinn*, and *Sullivan*.

*Id.* at 34.

The Court determined that "it was not foreseen that due to demographic surges, a strict ratio requirement would prevent cities from reaching the core goal of the consent decrees: parity. In other words, the Court-imposed formula turned out to be not a remedy for the past discrimination but a cause of <u>new</u> discrimination, which does have lingering effects into the present." *Id.* at 35 (emphasis in original).  Specifically, the Court found the following:

- <u>Since at least 2000</u>, "the decrees likely substantially undermined the efforts towards parity" in at least Lawrence and Chelsea, which "had an overall population that exceeded 50 percent Black and/or Hispanic in the 2000 federal census." *Id.* at 36.  The minority shares of the overall population in Worcester (22.04 percent) and Randolph (24.1 percent) dipped just below 25 percent in the 2000 federal census. *Id.*  The Court noted that it is "unclear when the minority population exceeded 25 percent" in those two cities. *Id.*

- <u>Since at least 2010</u>, "the cap likely adversely affected minorities" in Brockton, Holyoke, and Randolph. *Id.*  Moreover, the Court determined that "the cap adversely

---

[5] The Court also held that the qualified labor pool should be calculated based on updated population data.  *Beecher*, 295 F. Supp. 3d at 33-34.

6

affected minorities as of the 2010 census, and likely much earlier," in Springfield, where the minority population was 48.2% in 2000.  *Id.*

The Court therefore "decline[d] to impose a termination date with respect to the consent-decree cities whose harm pre-dated the 2010 census." *Id*.  The Court imposed a presumptive 5-year termination date for Lowell "[i]f the government proves that parity in Lowell is precluded by nondiscriminatory other factors" based on a determination that Lowell "has likely never been harmed by the cap." *Id*. at 36-37.

On July 17, 2018, the Court issued an Order to Modify the Governing Decrees.  *See* Dkt. 74.  The Court again declined HRD's request to impose a termination date on the consent decrees.  HRD did not appeal either the February 21, 2018 opinion or the July 17, 2018 order.

Thereafter, the parties filed joint status reports from 2019 through 2021.  *See* Dkts. 75-76, 78.  Lowell was released from the police decree in 2019—much earlier than the presumptive 5-year termination date that the Court had set in 2018—because data compiled by HRD showed that, at the end of 2018, the Black/Hispanic complement of Lowell police officers was 21.2%, which exceeded the 19.7% parity benchmark.  *See* Dkt. 75 at 5.  Based on data compiled by HRD at the end of 2021, the parties also agree that Brockton Police Department and Springfield Fire Department have reached rough parity and should be released from the decrees.[6]

---

[6] As explained in the parties' joint status report dated April 7, 2022, the minority complement within the Brockton Police Department (BPD) at the end of 2021 was 45.1%, and the parity benchmark approved by the Court is 45.2%.  Moreover, the minority complement within the Springfield Fire Department (SFD) at the end of 2021 was 60.8%, and the parity benchmark approved by the Court is 61.3%.  Because the difference between the minority complement and the parity benchmark approved by the Court in both departments is <1%, the parties agree that the BPD and SFD have reached rough parity and should be released from the decrees.

At a hearing on January 4, 2022, the Court re-raised the question of when the consent decrees should terminate and asked the parties to state their views on the matter as part of the status report(s) for 2022.

## IV. Termination of the Consent Decrees

The parties have considered whether and how to further modify the decrees by amending the termination provisions to set a definite end date for the decrees. To this point the parties have been unable to agree on a definite proposal. For the reasons set forth below, Plaintiffs submit that the decrees should end when rough parity is achieved. It was just four years ago that this Court rejected Defendants' proposal of a five-year sunset provision (*i.e.*, 2023), in a thoughtful well-reasoned opinion. Defendants have pointed to no circumstances that have changed since 2018 that would warrant revisiting this holding. *See Beecher*, 295 F. Supp. 2d at 35 ("The party seeking release from a consent decree bears the burden of proof."). In the alternative, a presumptive end date for the decrees should be set based on the amount of time the Court found that the remaining municipalities' efforts were hampered by the cap.

### A. The consent decrees should terminate only when the goal of parity is achieved.

While it is true that these decrees have been in place for some time, there is already a clear, well-defined end point set forth in the decrees: the date on which all municipalities reach a level of minority representation "commensurate with the percentage of minorities in the community." *See Quinn*, 325 F.3d at 24 ("Parity (or, at least, rough parity) is the key that unlocks the restrictions of the *Beecher* decree as to a particular community."). That language was in the original version of the Fire Decree, and it was added to the police consent decree at the "encourage[ment]" and "recommend[ation]" of the Court to conform the two decrees. *Castro v. Beecher*, 386 F. Supp. 1281, 1286 (D. Mass. 1975). As this Court noted, "[t]he First Circuit has thrice affirmed…that a city would not be released from the consent decrees until 'rough parity' was reached." *Beecher*,

8

295 F. Supp. 3d at 29.  The lifespan of the decrees is already limited to the time it takes to reach the requirements therein, and, indeed, only a handful of municipalities remain subject to the decrees, while the majority of the Commonwealth has been freed from further oversight.  *See Mackin*, 969 F.2d at 1278 (stating that "the decree's life is limited, remaining in force only until its requirements have been met" and "[i]ndeed, the proof of the present pudding is that, since 1974, more than fifty percent of the communities originally affected by the decrees have already been freed from further oversight").

The mere fact that it has taken longer than expected to reach complete parity is no reason to make the drastic change of setting an arbitrary sunset date to the consent decrees.  *See Beecher*, 295 F. Supp. 3d at 35 ("A court should not modify long-standing goals in a consent decree just because the goals have not been achieved").  As this Court indicated in its 2018 opinion, there are identifiable reasons why it has taken some communities longer than others to reach parity.  *See, e.g., id*. (finding that the cap "prevent[ed] cities from reaching the core goal of the consent decrees: parity").  In particular, the modification to remove the cap on minorities was intended to address at least one of those reasons.  Moreover, the role of the decrees in achieving (and maintaining) diverse fire and police departments is palpable, as is evidence that backsliding occurs when municipalities are released.  For instance, the Boston Police Department, which was released from the decree in 2004, has since experienced a decrease in diversity.  *See* Alanna Durkin Richer, *'We turn a blind eye': Boston's police remain largely white*, ABC NEWS (March 1, 2021), https://abcnews.go.com/US/wireStory/turn-blind-eye-bostons-police-remain-largely-white-76179620 (attached as Exhibit A); Vernal Coleman, *Boston police once resembled the community. But force has grown whiter as city becomes more diverse*, BOSTON GLOBE (June 30, 2020, https://www.bostonglobe.com/2020/06/30/metro/boston-police-once-resembled-community-force-

has-grown-whiter-city-becomes-more-diverse/ (attached as Exhibit B). Indeed, reporting indicates that in January 2021, "Boston police were about 65% white, according to numbers provided by the department, even though they make up only about 45% of the city." Exhibit A at 2. These numbers reflect a backslide from when this Court declared that Boston reached rough racial parity. *See* Exhibit B.

Moreover, the age of the decrees alone should not be a justification for termination. There are other examples of long-standing consent decrees in this country, which have lasted far longer than the decrees presently at issue.[7]

The modifications entered by the Court, including annual monitoring and reporting to the Court, have been implemented without undue difficulty, as previously reported by the parties, and have been effective. The decree-defined minority complement within each department, with the exception of the Lawrence Fire Department, has increased between 2016 and 2021, according to data collected by HRD, indicating continued progress towards parity:

Composition of "Black or African American" and "Latino or Hispanic"
Consent Decree Fire Departments Under Consent Decree

| **Department** | 2016 | 2021 |
|---|---|---|
| Chelsea | 28.1% | 35.2% |
| Holyoke | 20.8% | 43.1% |

---

[7] For instance, the American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music, Inc. (BMI) are subject to 81-year-old consent decrees that have been in effect since 1941. *See United States v. Broad. Music, Inc.*, 275 F.3d 168, 171-172 (2d Cir. 2001); *United States v. Am. Soc. of Composers, Authors & Publishers,* 599 F. Supp. 2d 415, 419 (S.D.N.Y. 2009). Additionally, a federal-court consent decree that was issued in 1972 governs political employment in Illinois. *Shakman v. Democratic Org. of Cook Cty.*, No. 69 C 2145, 2017 WL 962762, at *1 (N.D. Ill. Mar. 9, 2017) ("The Shakman Decree bars CCHHS from conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a government employee, upon or because of any political reason or factor.").

| Department | 2016 | 2021 |
|---|---|---|
| Lawrence | 34.4% | 31.1% |
| Springfield | 47.6% | 60.8% |

Composition of "Black or African American" and "Latino or Hispanic"
Consent Decree Police Departments: 2016 versus 2021

| Department | 2016 | 2021 |
|---|---|---|
| Brockton | 35.4% | 45.1% |
| Chelsea | 26.0% | 52.9% |
| Holyoke | 28.6% | 34.1% |
| Lawrence | 29.5% | 58.9% |
| Randolph | 26.1% | 26.3% |
| Springfield | 44.4% | 50.9% |
| Worcester | 20.4% | 23.4% |

The increases in several cities are particularly notable. For example, in 2017, Defendants argued that due to changing demographics, parity would never be possible in certain cities, or that it would take an excessive amount of time to reach that goal. *See e.g.*, Dkt. 53 at 2-3 ("As the share of Brockton residents who are Black or Hispanic and aged 20 to 34 increased by 50% between the 2000 and 2010 federal censuses and, according to the American Community Survey, the pace of that remarkable demographic shift has hardly flagged at all between 2010 and 2015. If such trends continue, and Brockton's hiring patterns remain steady, there is virtually no chance that Brockton will achieve parity in the foreseeable future."). But just over the last five years, the Holyoke Fire Department and the Chelsea Police Department have each jumped over 20 percentage points towards the goal of parity, while the Lawrence Police Department has increased by nearly 30 percentage points. Removal of the cap has had its intended effect of freeing up the

remaining municipalities to continue their progress towards parity—the goal that this Court and the First Circuit have affirmed and re-affirmed on numerous occasions.

Moreover, as noted above, two departments have reached rough parity this year (Springfield Fire Department and Brockton Police Department), and the parties have agreed they should be released from the decrees. Several other municipalities have narrowed the gap substantially and, if they remain on their current trajectory (now unimpeded by the cap), will reach parity soon.[8] The Springfield and Worcester Police Departments, for example, are both now within 2-3 percentage points of parity.[9] As Plaintiffs have previously argued, the life of the decrees will extend no further than necessary to ensure that their goals are reached in a reasonably expedient manner. Rather than set a sunset date solely for the sake of terminating the decrees, the more appropriate course is to allow the modified decrees time to run their course to allow the departments that remain subject to the consent decrees the chance to achieve the goal of parity.[10]

---

[8] Survey data compiled by HRD indicates that every department that remains subject to the decrees anticipates hiring between eleven and over one hundred new entry level uniformed hires through December 31, 2027. *See* Joint Status Report, Exhibit 2.

[9] As explained in the parties' joint status report dated April 7, 2022, the minority complement within the Springfield Police Department as of the end of 2021 is 50.9%. *See* Joint Status Report, Exhibit 1. The parity benchmark approved by the Court is 53.8%. The minority complement within the Worcester Police Department as of the end of 2021 is 23.4%. *Id.* The parity benchmark approved by the Court is 25.6%.

[10] While Plaintiffs support a number of the reforms suggested in the report of the Special Legislative Commission to Study and Examine the Civil Service Law, Personnel Administration Rules, Hiring Procedures and By-Laws for Municipalities not Subject to the Civil Service Law and State Police Hiring Practices ("Civil Service Commission Report"), issued on March 30, 2022, the recommendations are not viable alternatives to the decrees. First, many of the recommendations in the Civil Service Commission Report are merely suggestions that will require further legislative or administrative action; second, the recommendations' efficacy is unsubstantiated; and, third, the recommendations are insufficient to replace the requirements of the consent decrees, which have proven effective in reaching the parity goals.

> B. *Alternatively, the consent decrees should presumptively terminate after the amount of time that the cap adversely affected minority candidates.*

Alternatively, the consent decrees should presumptively be in effect for the amount of time that the cap adversely affected minority candidates. As explained above and by this Court, new constitutional violations inadvertently caused by the consent decrees were discovered in 2016, dating back to at least 2000 in some municipalities, which need to be remedied. Specifically, the Court determined that since at least 2000, Lawrence and Chelsea were likely hindered from progressing towards parity due to the cap. *Beecher*, 295 F. Supp. 3d at 36. The Court also found that the minority shares of the overall population in Worcester and Randolph, according to the 2000 census data, were slightly below 25 percent, but it was unclear when the minority population in those cities exceeded 25 percent such that the cap would have likely begun to adversely affect minority candidates.[11] *Id.* Moreover, the Court determined that since at least 2010, the cap adversely affected minorities in at least Brockton, Holyoke, Randolph, and Springfield. *Id.*

The constitutional violations caused by the cap lasted for at least eight or eighteen years, until the Court modified the decrees in 2018. Minority candidates were adversely affected, and the departments subject to the consent decrees were hindered from progressing towards the goal of parity for a substantial period of time. When constitutional violations occur for nearly two decades, as is the case in some of the affected municipalities, it is not surprising that the pernicious consequences are not cured instantaneously. Rectification of the violations will take patience, time, and effort, and, for this reason, there should be a presumption that the consent decrees will remain in place for as long as the cap adversely affected minorities in each respective

---

[11] The percentage of minorities in Worcester exceeded 25 percent at least since 2010 according to census data cited by the Court. *Id.*

13

municipality. If any of those municipalities reaches parity first, they would be released even before the presumptive end date.

Accordingly, for Lawrence, Chelsea, Worcester, and Randolph,[12] Plaintiffs submit that the consent decrees should presumptively remain in effect for eighteen years following the 2018 modification (*i.e.*, until 2036) and for Holyoke and Springfield, Plaintiffs submit that the consent decrees should presumptively remain in effect for eight years following the 2018 modification (*i.e.*, until 2026):

Fire Departments

| Department | Court's Determination of When Cap Likely Hindered Progress | Number of Years Cap Likely Hindered Progress | Plaintiffs' Proposed Presumptive Sunset Date |
|---|---|---|---|
| Chelsea | 2000 | 18 years | December 31, 2036 |
| Holyoke | 2010 | 8 years | December 31, 2026 |
| Lawrence | 2000 | 18 years | December 31, 2036 |

Police Departments

| Department | Court's Determination of When Cap Likely Hindered Progress | Number of Years Cap Likely Hindered Progress | Plaintiffs' Proposed Presumptive Sunset Date |
|---|---|---|---|
| Chelsea | 2000 | 18 years | December 31, 2036 |
| Holyoke | 2010 | 8 years | December 31, 2026 |
| Lawrence | 2000 | 18 years | December 31, 2036 |
| Randolph | 2000 | 18 years | December 31, 2036 |
| Springfield | 2010 | 8 years | December 31, 2026 |
| Worcester | 2000 | 18 years | December 31, 2036 |

---

[12] Given the closeness to the 25 percent of minority shares of the population in Worcester and Randolph in the 2000 census data, Plaintiffs submit that it is reasonable to assume that the cap likely hindered the progress of Worcester and Randolph, in addition to Lawrence and Chelsea, from reaching parity since 2000.

14

While these dates would be presumptive, any municipality could continue to be released before that date if parity is reached.  As noted above, the Springfield and Worcester Police Departments, for example, are both now within 2-3 percentage points of parity, and, if they maintain their current trajectory, may be eligible for release from the decree before Plaintiffs' proposed presumptive sunset date.

**V.      Conclusion**

Since the Court's modifications in 2018, municipalities have been freed up to continue their progress towards the parity goal that has long been affirmed and re-affirmed by the First Circuit.  Substantial progress has been made, with a number of cities reaching parity already and others likely to do so soon.

Accordingly, Plaintiffs do not believe there is any need for the Court to revisit its 2018 opinion by imposing an end date or a sunset provision for the decrees, after which they will no longer operate.  Should a presumptive end date be required, Plaintiffs believe it should be no sooner than the amount of time that the cap adversely affected minority candidates.  Plaintiffs look forward to discussing these issues with the Court at the next status conference.

[*signature block on following page*]

Respectfully submitted,

*/s/ Kevin S. Prussia*
Kevin S. Prussia (BBO #666813)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
kevin.prussia@wilmerhale.com

Jennifer John (BBO #694749)
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real
Palo Alto, CA 94306
(650) 858-6000
jennifer.john@wilmerhale.com

Oren M. Sellstrom (BBO #569045)
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 988-0608
osellstrom@lawyersforcivilrights.org

*Counsel for Plaintiff Boston Branch of the NAACP and Plaintiff-Intervenors MAMLEO and Vulcans*

April 7, 2022

## CERTIFICATE OF SERVICE

      I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

                              */s/ Kevin S. Prussia*
                              Kevin S. Prussia