UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON CHAPTER, NAACP, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> NANCY B. BEECHER, et al., <br><br> Defendants. | Civil Action Nos. 72-3060, 73-269-PBS |

| | |
|---|---|
| PEDRO CASTRO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> NANCY B. BEECHER, et al., <br><br> Defendants. | Civil Action Nos. 70-1220-W, 74-2982-C |

**MEMORANDUM AND ORDER**

August 17, 2022

Saris, D.J.

**INTRODUCTION**

Five decades ago, this Court entered consent decrees to remedy the discriminatory impact of certain state-administered examinations on Black and Hispanic applicants to local police and fire departments. The consent decrees called on cities and towns

1

to hire one minority candidate[1] for every three non-minority candidates (except in Boston and Springfield, where the ratio was one to one) until they reached a level of minority representation in their police and fire departments commensurate with the municipality's overall minority population. In the ensuing years, nearly all police and fire departments achieved the required parity, with five still subject to the consent decrees as of this writing: the Chelsea, Holyoke, and Lawrence fire departments and the Holyoke and Randolph police departments. The question before the Court is when to terminate the consent decrees even if these five departments have not met their parity benchmarks. After hearing and careful review of the parties' submissions, the Court modifies the consent decrees and orders their termination effective December 31, 2024.

**FACTUAL BACKGROUND**

The Court recited the history of the consent decrees at length in Boston Chapter, NAACP, Inc. v. Beecher, 295 F. Supp. 3d 26 (D. Mass. 2018), and assumes familiarity with that opinion, here sketching out only the facts relevant to the question before the Court.

In the early 1970s, the Court found that the Massachusetts

---

[1] For purposes of this litigation, the Court uses the term "minority" to encompass Black and Hispanic persons.

Human Resources Division's ("HRD") entrance examinations for police officers and firefighters discriminated against minority candidates. See Beecher, 295 F. Supp. 3d at 28. The Court entered consent decrees requiring more than 100 municipalities to hire police officers and firefighters using a one-to-three minority to nonminority ratio until they reached "rough parity" with their overall minority population. Quinn v. City of Bos., 325 F.3d 18, 24 (1st Cir. 2003).

In August 2016, the parties discovered that in municipalities where the minority population had grown to exceed twenty-five percent, the one-to-three ratio was placing a cap on the hiring of minorities—the opposite of its intended effect. See Beecher, 295 F. Supp. 3d at 29. The Court promptly modified the consent decrees to suspend use of the certification ratios where they were impeding minority hiring. See Dkt. No. 17. The Court also entered several remedial modifications. First, the Court ordered that 55 candidates whom the parties identified as having been directly harmed by the cap since 2012 be given the chance to move to the top of certification lists in future hiring cycles.[2] See Dkt. No. 24. With the parties' agreement, the Court also altered the one-to-three ratio such that one minority candidate would be hired for

---

[2] HRD could not identify candidates who may have been harmed by the cap before 2012 because the relevant records were lost during a change in computer systems. See Beecher, 295 F. Supp. 3d at 31.

every three candidates of any race (i.e., they need not exclusively be nonminority candidates) and ordered that ties on certification lists would go to minority candidates; that parity would be measured in terms of a municipality's qualified labor pool and not its total population; that Lawrence, Chelsea, and Holyoke would be subject to a one-to-one certification ratio; that any minority candidate who declines a position be replaced with the next-ranked minority candidate; and that the parties would update the Court annually on the remaining departments' progress toward parity. See Beecher, 295 F. Supp. 3d at 30–31.  The Court at that time declined to add termination provisions to the consent decrees, finding that the consent decrees had "undermined the efforts toward parity" in several communities.  Id. at 36.

Since the Court's decision in Beecher, the modifications have resulted in several communities achieving rough parity and exiting the consent decrees.  On June 29, 2022, the Court ordered the release of the Brockton Police Department and the Springfield Fire Department. See Dkt. No. 96.  Two weeks later, the Court approved the release of the Springfield and Worcester Police Departments and prospectively approved the release of the Lawrence and Chelsea Police Departments effective December 31, 2022. See Dkt. No. 101.  The question before the Court is whether to modify the consent decrees to add termination provisions now that the previous

4

modifications have had substantial time to operate.

## DISCUSSION

Under the Federal Rules of Civil Procedure,

> "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief."

Fed. R. Civ. P. 60(b).

A defendant may establish the need for modification of a consent decree by showing (1) "changed factual conditions make compliance with the decree substantially more onerous," (2) "[the] decree proves to be unworkable because of unforeseen obstacles," or (3) "enforcement of the decree without modification would be detrimental to the public interest." Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. 367, 384 (1992).

A race-conscious remedy must survive strict scrutiny: it must be justified by a strong state interest and narrowly tailored to achieve that interest. See Mackin v. City of Bos., 969 F.2d 1273, 1275 (1st Cir. 1992). The First Circuit has cautioned that "[i]n institutional reform litigation, injunctions should not operate inviolate in perpetuity." In re Pearson, 990 F.2d 653, 658 (1st Cir. 1993). In determining whether to end an institutional reform consent decree, a court should consider "whether the agency in question has come into compliance with constitutional

5

requirements," keeping in mind that principles of federalism dictate that "[a]n intrusion by a federal court into the affairs of local government should be kept to a bare minimum and not be allowed to continue after the violation has abated and its pernicious effects have been cured." Mackin, 969 F.2d at 1275-76.

Plaintiffs contend that the consent decrees at issue here should only terminate when each remaining police and fire department achieves rough parity. Alternatively, they ask that the Court terminate the consent decrees after the same number of years that the cap adversely harmed minority candidates in each remaining municipality: from 2000-2018 in some communities and from 2010-2018 for others. This would result in the consent decrees terminating no later than December 31, 2026, for the Holyoke Fire and Police Departments and by December 31, 2036, for the Chelsea and Lawrence Fire Departments and the Randolph Police Department. See Dkt. No. 87 at 14. Defendants submit that the consent decrees should terminate for all remaining municipalities by the end of 2024.

The Court agrees with Defendants. Because there is no contention that the harm from HRD's original, 1970's-era examinations is ongoing, the question is how long the Court should extend the remedial measures it imposed when the parties discovered the discriminatory effects of the cap on minority hiring in 2016.

6

The Court finds that HRD has implemented the consent decrees, including the 2018 modifications, in good faith and that much of the harm from the cap has already been cured. Every individual whom the parties identified as having been directly discriminated against because of the cap has now had a renewed opportunity for appointment through placement at the top of hiring certifications. See Dkt. No. 85 at 8. Moreover, since 2016, the number of minority officers within most of the remaining departments has increased—in some cases dramatically. For example, the minority complement within the Holyoke Fire Department more than doubled from 20.8% to 43.1%, closer to its parity benchmark of 55.5%. See Dkt. No. 86 at 3. This progress suggests that the modifications have had the intended effect of remediating the harm from the consent decrees' one-to-three certification ratios. Two additional years, for a total of eight since the cap was lifted in 2016, is a logical endpoint where the harm to each affected community began sometime between 2000 and 2010.

Termination at the end of 2024 is also appropriate because changed factual conditions—the growing minority population in the remaining municipalities—make achieving rough parity more elusive than initially anticipated. See Rufo, 502 U.S. at 384. In Lawrence, for example, demographic changes have pushed the fire department's parity benchmark to 77.8%, while its minority complement of firefighters sits at 31.1%. See Dkt. 86 at 4. The

7

parity benchmark reflects the rapid increase in the minority population in Lawrence: per the 2000 census, Lawrence's minority population represented 64.54% of its total population, while by the 2010 census, the minority population was 76.1% of Lawrence's total.  See Beecher, 295 F. Supp. 3d at 36.  In 2021, 77.2% of total applicants to the Lawrence fire department were Black or Hispanic.  See Dkt. 88-14.  Yet Lawrence projects to hire just six to ten new firefighters in the next three years for a department of 119 total firefighters.  See Dkt. Nos. 88-2, 88-12.  Even with a high percentage of minority candidates, achieving rough parity with the growth in minority population outpacing the rate of new hires is the very "Sisyphean fate" the First Circuit has warned against.  Pearson, 990 F.2d at 658.  Termination at the end of 2024 would give each remaining municipality a reasonable chance of making progress toward parity without unduly intruding into local affairs.  The eighteen-year extension that Plaintiffs seek is simply not narrowly tailored to remedying past harm as there is no reason to think it would capture any remaining individuals who were harmed by the cap and it would likely stretch the consent decrees beyond the period during which they could reasonably expect to achieve rough parity.

## ORDER

For the foregoing reasons, the Court orders that the consent decrees be modified to terminate effective December 31, 2024.  The

8

parties shall confer and submit a proposed modified consent decree within 30 days.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge